UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOAN VALENTE,

       Plaintiff,       **REPORT AND**
                   **RECOMMENDATION**

                  17-CV-3853 (JMA) (JMW)

    -against-


THE UNITED STATES OF AMERICA and,
UNITED STATES POSTAL SERVICE,

       Defendants.
-------------------------------------------------------------X

**A P P E A R A N C E S :**

Helen M. Benzie, Esq.
**Law Office of Vincent D. McNamara**
Tower Square Suite One
1045 Oyster Bay Road
East Norwich, NY 11732
*Attorney for Plaintiff*

Thomas Russell Price, Esq.
Diane C. Leonardo, Esq.
James H. Knapp, Esq.
Robert B. Kambic, Esq.
**United States Attorney's Office**
Eastern District of New York
610 Federal Plaza
Central Islip, NY 11722
*Attorneys for Defendants*


**WICKS,** Magistrate Judge:

   Federal courts have limited subject matter jurisdiction. One of those limitations includes

suits against the United States as it enjoys sovereign immunity. By statute, however, the United

States has waived immunity under certain circumstances. One such circumstance is the Federal

Tort Claims Act which waives immunity for damage suits for acts by government employees.

This case involves a slip and fall on a mat in a post office and raises the fundamental question of whether subject matter jurisdiction exists, which hinges on whether the post office cleaners were in fact "federal employees" or "independent contractors."

Plaintiff Joan Valente brings this action against the United States and the United States Postal Service (collectively, "Defendants") for negligence under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2401(b) and 2671–2680 for a fall that occurred on February 22, 2016, at the East Rockaway Post Office at 10 Main Street, East Rockaway, New York 11518 ("Post Office"). Before the Court are Defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(h)(3) or, in the alternative, motion for summary judgment pursuant to Fed. R. Civ. P. 56. (DE 38.) Plaintiff opposes these motions. (DE 39.) These motions are on referral to the undersigned by the Hon. Joan M. Azrack for a Report and Recommendation. (Electronic Order dated Oct. 20, 2022.)

For the reasons stated herein, the undersigned respectfully recommends Defendants' motion to dismiss be granted, and motion for summary judgment be denied as moot. If the District Judge does not adopt the undersigned's recommendation regarding Defendants' motion to dismiss, the undersigned respectfully recommends Defendants' motion for summary judgment be granted.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Undisputed Material Facts[1]

---

[1] Defendants ask the Court to deem any undisputed statements in their Rule 56. 1 statement (DE 38-2) admitted because Plaintiff, in many instances, failed to properly respond (*see* DE 39-1) and did not include a statement of additional facts in her response. (DE 40 at 7.) Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Report and Recommendation means that the Court has deemed the underlying factual allegation undisputed. Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it. Where relevant, however, the Court may cite directly to an underlying document. The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal. *See Stewart v. Fashion Inst. of Tech.,* No. 18-

### i. **The Fall**

On February 22, 2016, Plaintiff Joan Valente lived at 94 4th Avenue, East Rockaway, New York 11518, and had lived there since 1977.  (DE 39-1 at ¶ 1.)  Plaintiff was familiar with the Post Office as it was her "main post office," and she went there "at least once a week."  (DE 39-1 at ¶ 3.)  Plaintiff visited the Post Office in East Rockaway, New York on February 22, 2016, at approximately 3:00 p.m. with her two grandnieces, ages 5 and 8. (DE 39-1 at ¶¶ 2, 10.)  On that day, Plaintiff fell and sustained an injury.  (DE 39-1 at ¶ 4.)  Plaintiff walked into the Post Office, waited in line for about 10-15 minutes, and testified that she passed three counters to get to the counter by the door to return her package.  (DE 39-1 at ¶ 12.)

There are mats on the floor throughout the Post Office.  (DE 39-1 at ¶ 13.)  There is a mat located at the entrance to the Post Office, two at the door connecting the Post Office box area to the Lobby Area ("Lobby Area "), and four more mats in the Lobby Area.  (DE 39-1 at ¶ 13; *see* DE 38-8 (photographs).)  Plaintiff crossed over the mats in the Lobby Area to get to her counter.  (DE 39-1 at ¶ 13.)  There are two mats in the area in front of the counter that Plaintiff used.  (DE 38-8.)  Around 3:30 PM, once Plaintiff finished returning her package and received a receipt,

---

cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("'[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.'") (quoting *Knight v. N.Y.C. Hous. Auth.*, No. 03 Civ. 2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything."). "Additionally, to the extent [a party's] 56.1 statement 'improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party] without specifically controverting those facts,' the Court has disregarded [such] statement[s.]" *McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

Plaintiff turned around to walk away from the counter, at which point she fell and injured herself. (DE 39-1 at ¶ 16.)

Plaintiff testified that she was walking on the mat when she fell, and she ended up on the floor under the ledge of the counter. (DE 39-1 at ¶¶ 18-19.) There were no other items or any kind of clutter in the area in which she fell. (DE 39-1 at ¶ 20.) Plaintiff testified that as she "went to walk out, [her] right leg [grabbed] something and then [she] just fell down." (DE 39-1 at ¶ 16.) Plaintiff further testified she may not have even taken a real full step or may have taken just one step to walk away from the window when she fell. (DE 39-1 at ¶ 16.) Plaintiff was wearing open-toed shoes, specifically sandals, when she fell. (DE 39-1 at ¶ 9.)

Postal Clerk Carl-Henry Ceant testified that he had served Plaintiff and Plaintiff did not make any complaints to Ceant about the mats while she was returning her package and waiting for a receipt. (DE 39-1 at ¶ 46.) Plaintiff could not specifically recall whether she interacted with a male or female clerk but believed it was not a male. (DE 39-1 at 14.) Ceant was at the middle counter when Plaintiff fell and injured herself. (DE 39-1 at ¶ 48.) Ceant testified that he did not observe Plaintiff having any difficulty as she turned to leave his window. (DE 39-1 at ¶ 57.) However, Ceant did not see Plaintiff fall, he only saw her on the floor after he heard a thud and her crying out. (DE 39-1 at ¶ 55.) Ceant notified the Post Master Rachel Philip ("PM Philip") of the fall, who then went into the lobby and saw Plaintiff on the floor being helped by members of the police, fire department, and by EMTS. (DE 39-1 at ¶ 34.)

PM Philip was in her office at the time of the fall and was unable to observe the Lobby Area from her office, so she did not see Plaintiff fall. (DE 39-1 at ¶¶ 30-32.) PM Philip testified that she heard Plaintiff telling the EMTS that she had a "sciatica pain." (DE 39-1 at ¶ 36.) PM Philip took photographs of the area of the lobby where Plaintiff fell just after Plaintiff was

removed by the EMTS.  (DE 39-1 at ¶ 37.)  Ceant had no recollection of seeing anyone move anything in the lobby after Plaintiff fell and had no clue whether the mats were moved after the fall.  (DE 39-1 at ¶ 60.)  On February 22, 2016, when the fall occurred, the Post Office did not have a CCTV, monitoring system, or active cameras, and Ceant summarized his recollection of the events that occurred in a typed statement.  (DE 39-1 ¶ 54.)

PM Philip and Ceant both testified that they received no complaints about the mat or any other condition on the day of the accident including from Plaintiff, nor any time prior, and that there had been no prior accidents.  (DE 39-1 at ¶¶ 35, 40, 53, 55-56.)  Plaintiff was 67 years old at the time of the fall, and, *inter alia*, had multiple pre-existing medical conditions, was taking medication for high blood pressure and diabetes, and anti-rejection medication related to a kidney transplant.  (DE 39-1 at ¶¶ 4-6.)  Plaintiff was hospitalized, had surgery, and was otherwise treated for injuries after the fall.  (*See* DE 39 at 13.)

### i. Cleaning

PM Philip was the postmaster from 2013 until October 2016.  (DE 39-1 at ¶ 23.)  PM Philip's duties included overseeing the operation of the Post Office including its overall cleanliness, and the Post Office contracted with Creative Management Technology, Inc. ("CMT") to clean the Post Office pursuant to a janitorial services contract.  (DE 39-1 at ¶¶ 24-25.)  The cleaning crew worked daily from approximately 5:00 a.m. until 8:00 a.m. before the Post Office retail lobby opened at 9:00 AM.  (DE 39-1 at ¶ 26.)  PM Philip did not supervise the cleaners.  (DE 39-1 at ¶ 27.)  PM Philip had seen the cleaning crew working on some occasions including observing them mop, clean, and take out the trash while she was at the Post Office. (DE 39-1 at ¶ 27.)  PM Philip had also seen the cleaning crew move the mats when they were cleaning the Lobby Area.  (DE 39-1 at ¶ 28.)

Postal clerks typically enter the Lobby Area three times per day to replenish forms and postal products.  (DE 39-1 at ¶ 47.)  PM Philip testified that postal clerks would, if they saw any "unsafe practice situation, [] try to correct it" before returning to their window.  (DE 39-1 at ¶ 38.)  PM Philip testified that she never personally moved or directed anyone else to move, any of the mats in the Post Office.  (DE 39-1 at ¶ 29.)  Ceant worked at the Post Office starting in November 2015 and his primary assignment at the time of the fall was as a window clerk.  (DE 39-1 at ¶ 41.)  Ceant, as part of his duties, would enter the Lobby Area a few times throughout his shift to restock supplies and check that the area was clean.  (DE 39-1 at ¶ 43.)  Ceant testified that he never moved a mat in the Lobby Area from one place to another but had moved a mat before "just to kind of clean something, get something off it."  (DE 39-1 at ¶ 44.)  Ceant testified that he otherwise did not "do anything with respect to the mats" in the Lobby Area, and never had to adjust a mat to flatten it out.  (DE 39-1 at ¶ 44.)  Ceant also testified that he did not recall ever seeing a mat moved by people walking over them.  (DE 39-1 at ¶ 52.)

**B. Relevant Procedural Background**

Plaintiff filed the initial Complaint on June 27, 2017.  (DE 1.)  Plaintiff filed an Amended Complaint on the same day.  (DE 3.)  Defendants were granted an extension of time to answer, move or otherwise respond to the Amended Complaint, and filed their Answer on November 9, 2017.  (DE 9.)  The parties engaged in discovery and a bench trial on liability was subsequently scheduled for February 9, 2021.  (DE 26.)  The bench trial was adjourned, and the parties were referred by the Court to the Trial Ready Rapid Mediation Pilot Program.  (Electronic Order dated Mar. 25, 2021.)  The mediation was reported unsettled.  Defendants then moved for a pre-motion conference, which the Court waived, and the Court thereafter approved the parties' proposed briefing schedule.  (DE 33-35; Electronic Order dated Sept. 21, 2021.)  Prior to mediation, Defendants had

6

moved to preclude the testimony of Plaintiff's expert Brian Brady, which Plaintiff

opposed.  (DE 30; DE 31.)  While the parties' briefing on the motions was pending,

Defendants' motion to preclude Brian Brady's testimony was denied without prejudice to

be renewed at the appropriate time.  (*See* Electronic Order dated March 29, 2022.)

On April 1, 2022, Defendants' motion to dismiss for lack of subject matter

jurisdiction to Fed. R. Civ. P. 12(h)(3) or, in the alternative, motion for summary

judgment pursuant to Fed. R. Civ. P. 56 were filed.  (DE 38.)  Plaintiff opposes these

motions.  (DE 39.)  These motions were subsequently referred to the undersigned for

Report and Recommendation.  (Electronic Order dated Oct. 20, 2022.)

The Court addresses each motion in turn.

## II.     DEFENDANTS' MOTION TO DISMISS

### A. Legal Standard Under Rule 12(h)(3)

Rule 12(h)(3) provides that "if the court determines at any time that it lacks subject-

matter jurisdiction, the court must dismiss the action."  Fed R. Civ. P. 12(h)(3).  This is a

nonwaivable defense that a party may raise at any point.  *See Lyndonville Sav. Bank & Trust Co.*

*v. Lussier*, 211 F.3d 697, 700 (2d. Cir. 2000) ("[F]ailure of subject matter jurisdiction is not

waivable and may be raised at any time by a party or the court *sua sponte*").  The standards

under Rule 12(h)(3) and 12(b)(1) are cut from the same cloth.  *See Greystone Bank v. Tavarez*,

No. 09-CV-5192 (SLT), 2010 WL 3325203, at *1 (E.D.N.Y. Aug. 19, 2010) ("Except for the

pre-answer limitation on Rule 12(b)(1) motions, the distinction between a Rule 12(b)(1) motion

and a Rule 12(h)(3) motion is largely academic, and the same standards are applicable to both

types of motions.").

It is axiomatic that "'federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (quoting *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 374 (1978)).  One such jurisdictional limitation is that of subject matter jurisdiction, which prescribes "a court's competence to adjudicate a particular category of cases." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006).  The burden of proving, by a preponderance of the evidence, that subject matter jurisdiction exists rests on the plaintiff. *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016); *see also Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005) ("The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.").

The Court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) (internal citations and quotation marks omitted).  "[I]n a situation where, as here, the jurisdictional challenge is based on the FTCA, the government receives the benefit of any ambiguities." *Loew v. USPS*, No. 03-CV-5244 (HG), 2007 WL 2782768, *4 (E.D.N.Y. Feb. 9, 2007).

The Court can "rely on evidence outside the complaint" when assessing subject matter jurisdiction. *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015); *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, No. 01-CV-1574 (ILG), 2005 WL 2148981, at *1 (E.D.N.Y. Sept. 7, 2005) ("[I]n deciding a motion to dismiss for lack of subject

matter jurisdiction, the Court may consider evidentiary matters outside the pleadings, such as affidavits and exhibits.").

## B. Discussion

### i. The Federal Tort Claims Act

The Court generally does not have subject matter jurisdiction over cases that are initiated against the United States since the United States "is immune from suit save as it consents to be sued." *Peker v. Steglich*, No. 06-CV-6910 (SAS), 2007 WL 683796, at *1 (S.D.N.Y. Mar. 5, 2007), *aff'd,* 324 F. App'x 38 (2d Cir. 2009).  Plaintiffs bear the burden of demonstrating waiver of sovereign immunity, which is a prerequisite to subject matter jurisdiction, and any ambiguity in this matter is "construed strictly in favor of the sovereign." *Id.*; *Vidurek v. Pollen*, No. 20-CV-6714 (CS), 2021 WL 4066503, at *8 (S.D.N.Y. Sept. 7, 2021) ("Absent an 'unequivocally expressed' statutory waiver, the United States, its agencies, and its employees (when functioning in their official capacities) are immune from suit based on the principle of sovereign immunity.").

Federal question jurisdiction in this case is premised on the Federal Tort Claims Act, under which federal districts courts:

> "shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b)(1).[2]

---

[2] 28 U.S.C. § 2401(b) provides that "[a] tort claim against the United shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues."  The parties do not dispute timeliness.

As an initial matter, Defendants correctly argue that the United States itself is the only proper defendant in this action, not the USPS.  (DE 38-1 at 29.)  The "FTCA expressly provides that only the United States may be held liable for torts committed by a federal agency."  *See Akande v. U.S. Postal Serv.*, No. 12-CV-6034 (CM), 2013 WL 587204, at *2 (S.D.N.Y. Feb. 13, 2013) (citing 28 U.S.C. § 2679(a)).  The FTCA does not confer jurisdiction over the USPS, therefore, it is an improper party to this action.  *See Colucci v. United States Postal Serv.*, No. 21-CV-827 (MKB), 2021 WL 1902539, at *2 (E.D.N.Y. Apr. 20, 2021) (dismissing complaint that asserted a claim under the FTCA against the USPS "for lack of subject matter jurisdiction because the USPS is an improper party").  Plaintiff does not dispute this in her opposition, and instead states that she "will stipulate to the amendment of the caption to list the United States as the only defendant."  (DE 39 at 5 n.1.)

Accordingly, the undersigned respectfully recommends this action be dismissed against the USPS as a defendant.

### a.  The Independent Contractor Exception

The FTCA expressly provides a waiver of sovereign immunity because it authorizes suits against the United States for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment . . . ."  28 U.S.C. § 1346(b)(1).  However, this waiver is limited in scope, as the FTCA does not authorize suits against the United States for negligent acts of independent contractors.  The FTCA defines "Employee of the government" to include any "officers or employees of any federal agency" and specifies that "Federal agency" "does not include any contractor with the United States."  28 U.S.C. § 2671; *see also Leone v. United States*, 910 F.2d 46, 49 (2d Cir. 1990) ("The FTCA

waiver of sovereign immunity, however, does not extend to independent contractors." (citing 28 U.S.C. § 2671)), *cert. denied*, 499 U.S. 905 (1991).

Plaintiff alleges in her complaint that her injuries were caused by the negligent acts of "agents, servants, and/or employees" of the United States. (DE 3 at ¶ 18.) In particular, the cause was a "displaced and/or defective rug or mat." (DE 3 at ¶ 17.) Here, the parties' dispute as to the existence of subject matter jurisdiction is focused on the applicability of the FTCA's independent contractor exception. Defendants aver that cleaning and positioning the mats was part of the daily responsibilities of the cleaning crew of a custodial company with which the Post Office contracted. (DE 38-1 at 15-18.) Plaintiff argues that the Post Office retained control over the mat placement and supervised the cleaners such that they were employees, and the exception does not apply. (DE 39 at 13-17.)

Whether someone is a "federal employee or an independent contractor is a question of federal law." *Loew*, 2007 WL 2782768, at *4. The Court must determine whether the alleged negligent act was one caused by a federal employee or an independent contractor within the meaning of the FTCA. *Id.* If the former, jurisdiction over Plaintiff's claim is appropriate, however, if the latter, the FTCA provides no basis for jurisdiction over this matter. Thus, the question of subject matter jurisdiction hinges on whether the cleaners were federal employees or independent contractors.

In *Logue v. United States*, the Court opined that the employee versus independent contractor analysis "turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract." *Logue v. United States*, 412 U.S. 521, 527 (1973). In *Orleans*, the Court added to that analysis whether "day-to-day operations" of the individuals in question were supervised by the federal government. *United States v. Orleans*,

425 U.S. 807, 815 (1976).  Courts in the Second Circuit employ a "strict control test" to make this determination.  *See Zimmerman ex rel. Zimmerman v. United States*, 171 F. Supp. 2d 281, 290 (S.D.N.Y. 2001) (citing *Leone*, 910 F.2d at 50).  The relevant inquiry here is whether the Post Office "controlled the detailed physical performance of the contractor or whether the [Post Office] supervised the day-to-day operations of the contractor."  *Fraser v. United States*, 490 F. Supp. 2d 302, 310 (E.D.N.Y. 2007); *see also Korotkova v. United States*, 990 F. Supp. 2d 324, 327 (E.D.N.Y. 2014) ("The hallmark of an independent contractor is that the United States does not direct and control the detailed physical performance of the contractor." (internal quotations omitted)).  Where "the government exercises broad supervisory powers, reserves the right to inspect, or monitors compliance with federal law, an independent contractor relationship will most often be found."  *Zimmerman*, 171 F. Supp. 2d at 290.

Ordinarily, courts begin by looking at the terms of the contract in making this determination.  *See Fraser*, 490 F. Supp. 2d at 310.  Plaintiff notes that there were only four pages of documents produced reflecting the work the cleaners were to do and there was no copy of the contract itself or terms and conditions of the contract produced in support of Defendants' motion.  (DE 39 at 10.)  Plaintiff further argues that since Defendants never produced a contract in support of their subject matter defense or motion, their application fails to satisfy the standard set forth in *Yesina v. United States*, 911 F. Supp. 2d 217 (E.D.N.Y. 2012).  (DE 39 at 15.)  Plaintiff states that in *Yesina*, the United States produced a detailed contract in support of its motion, and the operator of the facilities took on sole day to day responsibility for the employees and agreed to hold the United States harmless, defend, and indemnify it.  (*See* DE 39 at 15.)

Defendants state that they have found no holding in *Yesina* that the failure to produce a detailed contract requires denial of their motion.  (DE 38-1 at 10.)  A review of the decision leads

to the same conclusion.  In *Yesina*, the court looked at the terms of the contract produced as it was "required to do" and found that the contract made clear that the agency did not control the "detailed physical performance of the contractor or supervise" the contractor's day-to-day operations.  *Yesina*, 911 F.Supp.2d at 221–22.  However, no rule that a detailed contract itself is required to support an independent contractor defense can be discerned from the court's holding.

Defendants correctly argue that Plaintiff has failed to offer any evidence to rebut the undisputed and admitted testimony of PM Philip and Ceant that there was a cleaning crew contracted to clean and maintain the Post Office including mat placement.  (DE 38-1 at 10.)  And that evidence of the contract, the pages produced, was supported by the testimonial evidence, (DE 38-1 at 10).  *Cf. Zimmerman*, 171 F. Supp. 2d at 290 (finding that the contract produced was a boilerplate form with attached schedules and was insufficient standing alone where it was "the only factual evidence" provided that touched upon degree of control).

Defendants contend that (1) the contracted cleaning crew cleaned and maintained the Post Office and, notably, positioned the mats as part of their daily responsibilities; (2) PM Philip testified that the postal clerks were not responsible for mat placement and movement; and (3) the Post Office neither supervised nor exercised control over the cleaners' performance of their day-to-day work under the contract.  (DE 39-1 at 10.)  Plaintiff argues there was no transfer of responsibility to an independent contractor in this case.  (DE 39 at 15.)  Plaintiff notes that (1) PM Philip's testimony confirms that the Post Office had control over the arrangement and equipment in the window service, and (2) though PM Philip did not supervise the cleaners, a subordinate employee who reported to PM Philip did.  (DE 39 at 15.)

Plaintiff fails to point to evidence supporting their assertion that a subordinate employee supervised the cleaners.  The portion of PM Philip's testimony cited for this proposition reflects

otherwise.  PM Philip, when asked if she inspects the work done by the cleaners to ensure compliance, testified that she has a supervisor underneath her.  (DE 39-7 at 14-15.)  When asked what that supervisor's job is, Philip testified that he "managed the retail lobby and the carrier workforce."  (DE 39-7 at 14-15.)  When describing the supervisor's duties, PM Philip testified that those duties, relevant to the Lobby Area, were to "to make sure that the employees, retail employees are in uniform compliance, the policies and procedures, customer service, customer satisfaction, selling our products, USPS products."  (*Id*.)

The Post Office contracted with Creative Management Technology, Inc. ("CMT") to clean the Post Office pursuant to a janitorial services contract.  (DE 39-1 at ¶¶ 24-25; DE 39-7 at 89) ("United States Postal Services Janitorial Services Contract" with "Creative Management Technology, Inc.").  The work schedules reflect that the cleaners were generally responsible for the cleaning and maintenance of the Lobby Area.  (*See* DE 39-7 at 90-92.)  PM Philip and Ceant's testimony reflects that postal clerks were never directed to place mats, move mats, or deal with the mats in any fashion, with the exception of Ceant at some point cleaning some substance off of one of the mats when he noticed it.  (DE 39-1 at ¶¶ 29, 44.)  Rather, the cleaning crew moved the mats and placed them back as part of their duties in the morning before the lobby opened.  (DE 39-1 at ¶ 28.)  Plaintiff has pointed to no evidence showing that PM Philip or any Postal Clerk directed the cleaners, provided specific instructions, or otherwise controlled the detailed physical performance of the cleaners on a routine, let alone on a day-to-day, basis.

Indeed, Plaintiff's own assertions support the conclusion that the Post Office did not exercise such control.  Plaintiff states: (1) "[n]either the Postmaster who testified nor the window clerk who dealt with Ms. Valente were familiar with any procedure for checking the positioning of the mats in front of the customer service windows;" (2) "[PM Philip] just had a schedule for

the work to be done with no verification or inspection required;" and (3) "[PM Philip] only had the four pages, [] and did not have any more documentation of what the cleaners were to do." (DE 39 at 10.)  The fact that PM Philip and postal clerks did not have detailed knowledge of what the cleaning crew was supposed to do under the contract hardly supports the inference that they then were also somehow able to direct the detailed physical conduct of the cleaning crew on a day-to-day basis.

The parties agree that PM Philip generally oversaw the operation of the Post Office.  (DE 39-1 at ¶¶ 24-25.)  As Defendants point out, regardless of whether Defendants retained overall supervision of the contract, that does not make a contractor an employee of the government sufficient to negate the independent contractor defense.  (DE 38-2 at 11.)  *See Leone*, 910 F.2d at 50 ("[W]hile the FAA acts generally as an overseer, it does not manage the details of an AME's work or supervise him in his daily duties. Indeed, neither the supervision provided by the Federal Air Surgeon nor the FAA procedures to evaluate the AMEs entail on-site review or day-to-day management."); *Carter v. United States*, No. 96-CV-9139 (MBM), 1998 WL 744009, at *3 (S.D.N.Y. Oct. 26, 1998) ("The government could approve of procedures and inspect the performance of PMS, but the government did not provide day-to-day supervision"); *Yesina*, 911 F. Supp. 2d at 221 ("The fact that [the agency] . . . supervised Aviator to some extent in its carrying out of the Contract does not save [plaintiff's] complaint."); *Loew*, 2007 WL 2782768, at *5 ("The mere fact that the government maintained the right to inspect the progress of the work is not sufficient to convert an independent contractor into an employee."); *Fraser*, 490 F. Supp. 2d at 311 ("The Government is immune to liability even where it retains the right to inspect a contractor's work or its compliance with regulations.").

Plaintiff further states that "admittedly," the window clerks and Post Office employees also shared responsibility for the Lobby Area "after the cleaners left."  (DE 39 at 15.)  Plaintiff points to internal USPS manuals that indicate that the employees on site are generally responsible for the condition of the space.  (DE 39 at 14.)  Thus, Plaintiff avers that there was only a partial delegation of responsibility, such that the United States remains liable for its own acts or omissions.  (DE 39 at 15.)  Plaintiff then cites to *United States v. Olson*, 546 U.S. 43, 44–45 (2005) to state that "[A]ccordingly, under New York law applicable to property owners, the independent contractor defense fails and FTCA subject matter jurisdiction exists."  (DE 39 at 15.)

*Olson* did not involve the independent contractor defense, rather it involved an interpretation of the "private person" standard under the FTCA with respect to the United States. *See Olson*, 546 U.S. at 46.  Plaintiff makes no effort to connect the dots here.  And, to the extent Plaintiff attempts to rely on New York State law to assert that possession and control of the premises alone is a sufficient basis to maintain a claim against the United States under the FTCA, that argument has no legs.  The FTCA's waiver is limited to torts by employees and does not encompass general premise liability.  *See Haskin v. United States*, 569 F. App'x 12, 16 (2d Cir. 2014) (summary order) ("[A] duty under "state law cannot override the United States' sovereign immunity from suits for injuries caused by the torts of its independent contractors."). The independent contractor exception forecloses the United States from "State tort liability" related to an independent contractor's delegated duties.  *See Norman v. United States*, No. 95-CV-4111 (HJH), 1996 WL 377136, at *5 (E.D. Pa. July 3, 1996), *aff'd*, 111 F.3d 356 (3d Cir. 1997).  Thus, any attempt to impose liability on the United States for a "generalized breach of

duty" under state law premised only on possession and control of the Post Office, is unavailing. *Id*.

Plaintiff does not cite to any testimony that the placement or movement of the mats was a specific responsibility of the Post Office employees. PM Philip and Ceant's testimony reflects that postal clerks were never directed to place mats, move mats, or deal with the mats in any fashion. (DE 39-1 at ¶¶ 29, 44.) The record reflects that responsibility was delegated to and almost exclusively carried out by the cleaning crew. (DE 39-1 at ¶¶ 24-25, 28; DE 39-7 at 89.) And the cases Plaintiff relies on for the assertion that partial delegation of responsibility withstands application of the independent contractor exception involve different circumstances as far as partial delegation is concerned. *See Nkansah v. United States*, No. 1:18-CV-10230 (PAC), 2020 WL 1435178, at *5 (S.D.N.Y. Mar. 24, 2020) (finding dismissal inappropriate at that stage since issues of fact remained as to the negligence of the federal employees themselves because the "United States explicitly retain[ed] financial responsibility and power of pre-approval for all *outside* care provided to detainees." (emphasis in original)); *Harvey v. United States*, No. 14-CV-1787 (PAC), 2017 WL 2954399, at *5 (S.D.N.Y. July 10, 2017) (finding that plaintiff's claims fell within undelegated duties and responsibilities because "ICE contracted with OCCF to provide detainees on-site and emergency healthcare, but retained added responsibilities for all off-site non-emergent health needs."); *Haskin*, 569 F. App'x at 15 (involving claims of direct negligence on part of the postal employees who customarily checked the sidewalk area for snow and ice and where the federal government had "retained responsibility for inspecting the Branch's sidewalks when less than two inches of snow fell."); *Gonzalez v. U.S.*, 690 F. Supp. 251, 253 (S.D.N.Y. 1988) (discussing the scope of the discretionary function exception related to acts by federal employees).

Plaintiff has not carried her burden to establish that this Court has jurisdiction over her claims under the FTCA.  Accordingly, the undersigned respectfully recommends Defendants' motion to dismiss pursuant to Rule 12(h)(3) be granted, Defendants' motion for summary judgment be terminated as moot, and Plaintiff's complaint be dismissed.

## III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

If the District Judge disagrees with the undersigned's recommendation as to Defendants' motion to dismiss, then the undersigned respectfully recommends that Defendants' motion for summary judgment in any event be granted.

### A.  Legal Standard Under Rule 56

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).  Once the movant meets its initial burden, the nonmovant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York¸* 316 F.3d 93, 100 (2d Cir. 2002).

The Court is to believe the evidence of the nonmovant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert

conclusions that are unsupported by arguments or fact. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).  The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to determine whether triable issue of fact exist.  That is, the court's function is "issue finding," not "issue resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).

## B. Discussion

At the outset, the Court notes that "New York's negligence law governs this controversy because, under the FTCA, the United States' liability for injuries caused by the negligent acts or omissions of its employees is determined 'in accordance with the law of the place where the act or omission occurred.'" *See Tzul v. United States*, No. 12-CV-804 (NGG) (JMA), 2014 WL 4773972, at *3 n.4 (E.D.N.Y. Aug. 14, 2014) (citations omitted), *report and recommendation adopted*, 2014 WL 4773974 (E.D.N.Y. Sept. 24, 2014).  The fall at issue here occurred in New York, and thus, liability is properly determined using New York law negligence principles. *See id*.  The parties appear to dispute however, whether state or federal procedural law is the relevant body of law here.  Defendants point to federal law, whilst Plaintiff repeatedly cites to New York state law principles.  Defendant is correct that federal law governs.  Though liability itself is determined pursuant to the substantive law of the state, the "[t]he procedural aspects of an FTCA action are governed by federal law." *Bogery v. United States*, No. 17-CV-6996 (VEC), 2018 WL 4265901, at *3 (S.D.N.Y. Sept. 6, 2018).

Unlike the burden for slip and fall cases under New York law, "under federal law, the moving party need not make any affirmative *prima facie* showing on a motion for summary

judgment and may discharge its burden of proof merely by pointing to an absence of evidence to support an essential element of Plaintiff's claim." *Id*. (internal quotation marks omitted). Thus, to the extent Plaintiff makes arguments that Defendants have not carried their burden to affirmatively disprove any specific element, those arguments are out of place. (*See, e.g.*, DE 39 at 20.) ("The proffered general inspection testimony does not meet defendant's' burden on lack of constructive notice under New York law.").

### i.     Negligence

Under New York law, a *prima facie* case of negligence requires a plaintiff to show: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury resulting therefrom." *Tzul*, 2014 WL 4773972, at *3 (citing *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)). Specifically, in a trip and fall case, plaintiff must establish:

> (1) that a hazardous or dangerous condition existed; (2) that the defendant either created the condition or had actual or constructive knowledge of it and failed to correct it within a reasonable time after acquiring such knowledge; and (3) that the plaintiff's injury was proximately caused by the hazardous or dangerous condition.

*Leonardi v. United States*, No. 11-CV-4827 (LDW) (GRB), 2013 WL 5295714, at *2 (E.D.N.Y. Sept. 18, 2013).

 "[I]t is also well-established that '[a] plaintiff's inability to identify the cause of the fall is fatal to the cause of action because a finding that the defendant's negligence, if any, proximately caused the plaintiff's injuries would be based on speculation.'" *See Haxton v. PL Smithtown, LLC*, No. 17-CV-3979 (SJF) (SIL), 2020 WL 1244849, *23-24 (E.D.N.Y. 2020) (quoting *Aristizaba v. Kostakopoulus*, 159 A.D.3d 804, 860 (N.Y. App. Div. 2d Dept. 2017)). Defendants argue that as threshold matter, Plaintiff has not, as she is required to, even established or identified the cause of her fall above the level of pure speculation. (DE 39-1 at 18.) The Court agrees.

Plaintiff testified that she was walking on the mat when she fell, and she ended up on the floor under the ledge of the counter.  (DE 39-1 at ¶¶ 18-19.)  There were no other items or any kind of clutter in the area in which she fell.  (DE 39-1 at ¶ 20.)  Plaintiff testified that as she "went to walk out, [her] right leg [grabbed] something and then [she] just fell down."  (DE 39-1 at ¶ 16.)  Plaintiff testified she may not have taken even a real full step or just one step to walk away from the window when she fell.  (DE 39-1 at ¶ 16.)  Plaintiff also testified that there was nothing "unusual" about the mat and did not identify any defects with the mats in the area.  (DE ¶ 17.)  Plaintiff further testified that her two grandnieces and another customer told her that she tripped over a mat, however, Defendants correctly argue that these statements are inadmissible hearsay, and nonetheless, fail to provide any specific detail as to what, if any, defect in the mat caused Plaintiff to trip.  (DE 39-1 at 20.)

Plaintiff's opposition fails to squarely address the issue of causation.  (DE 39.)  Instead, Plaintiff's arguments relate to whether the arrangement of the mat was effectively a trap.  (DE 39 at 21.)  Even a cursory review of the photographs Plaintiff relies on, taken by PM Philip the day of the accident (DE 39-7 at 96) and by one of Plaintiff's grandnieces the following day (DE 39-7 at 8), reflects that Plaintiff's theory of the fall is inconsistent with her own testimony and with the evidence offered in support of it.  Plaintiff states that the February 22, 2016 photographs show that "the mats are at an angle and [were] shifted by the dirt line from where they were earlier," and that the February 23, 2016 photographs "indicated the mats tended to move with traffic and were against the counter baseboard."  (DE 39 at 21.)

Plaintiff's expert affidavit, the admissibility of which is disputed, reflects the opinion that the two mats appear to partially overlap at the seams and, this "*can* leave the edge of the rug raised," and Plaintiff's accident as described in her deposition testimony "is consistent with her

sandal being caught under the lifted edge of a mat." (DE 39-8 at 5. (emphasis added)) However, Plaintiff testified that as she "went to walk out, [her] right leg [grabbed] something and then [she] just fell down," and she may not have even take a full step. (DE 39-1 at ¶ 16.) The photograph taken by PM Philip of the area on February 22, 2016, shows two mats next to each other, with the mat to the left at a slight angle, and the bottom area of the mats appear to meet. (DE 39-7 at 96.) Plaintiff testified that something grabbed her *right* leg as she turned away, rather than her left leg, which would be where the mats "appear" to overlap.

Additionally, PM Philip took the photographs of the area of the lobby where Plaintiff fell just after Plaintiff was removed by the EMTS. (DE 39-1 at ¶ 37.) Thus, given the fact that Plaintiff fell on the mats, and was on the floor being helped by members of the police, fire departments and EMTS, the shift in the angle of the mats, does not show the position of the mats at the time of the fall, and whether they overlapped at the seams. (DE 39-1 at ¶ 34.)

Plaintiff has not identified the alleged defect or dangerous condition, nor has she connected any such alleged defect or dangerous condition to her fall, beyond the level of "speculation and conjecture." *See Haxton,* 2020 WL 1244849, *8, 10 (granting summary judgment in part where plaintiff's "testimony demonstrated that she could not identify the cause of her fall"); *Bilska v. Truszkowski*, 171 A.D.3d 685, 686–87 (2019) (finding summary judgment appropriate where plaintiff's deposition testimony "demonstrated, prima facie, that she was unable to identify the cause of her fall without resorting to speculation" in part because plaintiff testified that she "personally didn't see any water dripping, but there must have been a drip from the ceiling because the ground was wet."); *Stevenson v. CBS Broadcasting, Inc.,* No. 110806/05, 2011 WL 247005 (N.Y. Sup. Ct. Jan. 19, 2011) (citing *Martinez v. Trustees of Columbia University in City of New York*, 271 A.D.2d 223, 224 (1st Dept 2000)) ("Even if the steps

constituted a dangerous or defective condition, plaintiff has not presented evidence connecting this alleged defect to her fall, rather than due to her own misstep.").

Assuming Plaintiff could identify the cause of her fall, there is still insufficient evidence in the record for Plaintiff to establish the remaining elements of her negligence claim as discussed below.

### a. Hazardous or Dangerous Condition Existed

A condition generally will not be deemed as "'hazardous' or 'dangerous' if it was readily observable through the ordinary use of the senses." *Leonardi,* 2013 WL 5295714, at *3 (citing *Jang Hee Lee v. Sung Whun Oh,* 3 A.D.3d 473 (2d Dep't 2004)). In other words, a defendant cannot be liable "when the allegedly dangerous condition complained of was open and obvious, particularly where the injured plaintiff was aware of it." *Id.*; (quoting *Nardi v. Crowley Marine Assocs., Inc.,* 292 A.D.2d 577 (2d Dep't 2002)). Though questions of negligence are typically left to the factfinder, New York has an exception in such trip-and-fall negligence cases called the trivial defect doctrine. *See Coyle v. United States*, 954 F.3d 146, 149 (2d Cir. 2020).

The trivial defect doctrine recognizes "that a defendant 'may not be cast in damages for negligent maintenance by reason of trivial defects on a walkway . . . as a consequence of which a pedestrian might merely stumble, stub his toes, or trip over a raised projection.'" *Id.* (quoting *Hutchinson, 26 N.Y.3d* at 78). For example, the Court of Appeals of New York has stated,

> [t]here is no rule that [tort] liability, in a case involving minor defects in the pavement, turns upon whether the hole or depression, causing the pedestrian to fall, is four inches, or any other number of inches, in depth….The critical inquiry is whether, after considering the time, place, and surrounding circumstances of plaintiff's injury, *along with* the crack's height differential, a defective condition can reasonably be said to exist.

*Trincere v. Cty. of Suffolk*, 90 N.Y.2d 976, 977 (1997) (internal quotations & citations omitted).

Defendants argue that even assuming Plaintiff could identify a known dangerous condition that caused her fall, any such alleged dangerous condition was trivial as a matter of law.  (DE 38-1 at 21.)  Plaintiff instead asserts that the arrangement of the mats was effectively a trap.  More specifically, Plaintiff states that she testified that "she turned took a step and her foot caught on something involving the mat causing her to fall. This is an acknowledgement of a trap or a nuisance in the placement of the mat," and not a trivial defect.  (DE 39 at 21.)

Plaintiff points to the February 22, 2016 and February 23, 2016 photographs "showing the mat with a seam in front of the service window and at an angle with a gap on one side and no gap on the other."  (DE 39 at 22.)  Again, the February 22, 2016 photograph (DE 39-7 at 96) was taken after Plaintiff fell, numerous people assisted her, and she was removed by EMTs, and thus, hardly shows the precise placement of the mat at the time of the fall.  Moreover, the February 23, 2016 photograph (DE 39-7 at 97), taken the following day, showing a gap between the mats and a different placement, does not reflect the precise positioning of the mats at the time of the fall.

Nonetheless, even accepting that the February 22, 2023 photograph is an accurate representation of the positioning of the mats at the time of Plaintiff's fall, the fact that the mats "appear" to overlap at a certain portion, is too trivial under the circumstances here to support a claim of negligence.  Accepting Plaintiff's assumptions, for purposes of assessing whether the triviality doctrine applies in this case, these photographs are adequate to show the conditions in place at the time of the fall.  *See Coyle*, 954 F.3d at 146 (finding photographs taken years later were sufficient to establish the conditions in place during the fall in part where plaintiff attested the mats in the photographs were approximately the same dimensions and placed in the same area).

Defendants note that the Second Circuit's decision in *Coyle* supports their argument. In *Coyle*, the Plaintiff argued that the placement of a one-inch thick black mat on a black floor in a security screening area in the path of passengers, constituted a dangerous condition. *Id.* at 149. There, the Court found that the record reflected that the plaintiff was "not naturally distracted from looking down at [her] feet," and did not claim that the area was "dimly lit, or crowded, or even that she was in a rush to make her flight." *Id.* at 149–150. The Court concluded that "[i]n the absence of any such variables, the presence of a floor mat placed on the floor, even a one-inch thick black mat on a black floor, is—under the triviality doctrine—simply not a sufficiently dangerous condition to constitute negligence." *Id.* at 150.

Similarly, here, Plaintiff did not testify that she was unable to see the mat, was naturally distracted from looking at her feet, that the Lobby Area was too crowded or dimly lit, or that she was in a particular rush. Plaintiff also does not dispute Defendants' assertion that a review of the photographs reflects that the mats in the Lobby Area were "less than one-inch thick with a rubber backing, clearly visible, in a well-lit area . . . ." (DE 39-1 at 23.) Plaintiff stood in line for 10-15 minutes before approaching the counter, saw no clutter in the area, testified that there was nothing "unusual" about the mat, and did not identify any defects with the mats in the area. (DE ¶¶ 11, 17, 20.) A review of the photographic evidence also shows no physical defects in the mats.[3] (DE 38-8.)

---

[3] Plaintiff asks the Court for an adverse inference in her favor since the mats themselves were not preserved. (DE 39 at 17, 20-21.) Defendants argue that Plaintiff has not articulated or established, *inter alia*, how the physical mats themselves are relevant to her claim of defective mat placement, (DE 40 at 13 n.4). *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (noting that the party seeking an adverse inference must establish, *inter alia*, "that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." (citation omitted)). Given the photographs produced in this case by both parties shortly after the incident that sufficiently depict what the physical mats themselves would have as relevant to Plaintiff's claim, the Court sees no reason for such an inference.

Plaintiff distinguishes *Coyle* by noting that the case involved a "black mat on a black floor with no contemporaneous photographs," and there the federal agency took responsibility for the security screening area and had acknowledged having placed the mat in that area.  (DE 39 at 22.)  Whereas here, there are photographs from February 22, 2016, and February 23, 2016, "showing the mat with a seam in front of the service window at an angle with a gap on one side and no gap on the other."  (DE 39 at 22.)  This, Plaintiff asserts, is not a trivial defect as a matter of law, while citing to *Besserman v. Troncale*, No. 18551/2011 (Suffolk County Sup. Ct. June 25, 2015). (*Id.*)

Plaintiff further states that the mat placement violated American Society for Testing and Materials ("ASTM") safety standards.  (DE 39 at 11.)  Plaintiff relies on Brady's expert report, which in turn cites to the ASTM standard for safe walking surfaces.  (DE 39-8 at 5.)  The relevant paragraph of that standard provides:

> Mats, runners, and area rugs shall be maintained so as not to create pedestrian hazards. Mats, runners and area rugs shall not have loose or frayed edges, worn edges, worn areas, holes, wrinkles or other hazards that may cause trip occurrences.

(DE 39-8 at 5.)

First, even making an inference in Plaintiff's favor that since the mats were at a slight angle, and together at the seam in one location but slightly apart at the other, there was overlap of the mats causing a raised edge, that overlap would have been about or less than one inch above the ground -- the thickness of the mats themselves.  Defendants dispute the admissibility and relevance of the expert report but even so, correctly argue that these standards are non-binding. Plaintiff has presented no evidence that the Post Office adopted the ASTM standards, or that noncompliance rendered the condition non-trivial.  (DE 40 at 6.)  *See Estrella-Jones v. United States*, No. 13-CV-5454 (CBA) (LB), 2016 WL 7243540, at *5 (E.D.N.Y. Dec. 14, 2016) ("The

Court has not found any New York case law that elucidates the notion of a 'toe trap,' Plaintiff's expert relied on the non-binding [ASTM] standard for 'safe walking surfaces.'") *aff'd*, 706 F. App'x 28 (2d Cir. 2017), *as amended* (Dec. 21, 2017); *Whaley v. JJ Realty of NY, LLC*, 16 Misc. 3d 1117(A), 847 N.Y.S.2d 899 (Sup. Ct. 2007) (finding that expert testimony relying on the ASTM "Standard Practice for Safe Walking Surfaces, is also insufficient to raise a triable issue of fact in the absence of any evidence that these guidelines or recommendations reflect a violation of an adopted and implemented industry standard or generally accepted safety practice.").

Second, *Besserman* involved a piece of wood sticking up at the exit of building, which plaintiff described as a makeshift step, which is far different than the circumstances related to the mats at issue here. *See generally Besserman v. Troncale*, No. 18551/2011 (Suffolk County Sup. Ct. June 25, 2015). Third, the fact that in *Coyle*, there was a black mat on a black floor, which would make it less visible than the color contrast in this case, and that the photographs were from years later rather than the day after, only bolsters a finding that the alleged defect in this case was too trivial. *Cf. Coyle*, 954 F.3d at 149 ("Ordinarily, the evidence as to the conditions that led to a fall are contemporaneous with the incident."). Additionally, the Post Office was Plaintiff's "main post office," and she went there "at least once a week," such that the mats and their general arrangement was no surprise to Plaintiff. (DE 39-1 at ¶ 3.) *See Kam Lin Chee v. DiPaolo*, 138 A.D.3d 780, 783 (2016) (noting that plaintiff "testified at her deposition that she had traversed the sidewalk on numerous previous occasions without incident before the incident at issue.").

Considering all of the circumstances, resolving all reasonable inferences in Plaintiff's favor, Plaintiff has not presented sufficient evidence to create a triable issue of fact as to whether

the mats in question presented a trap or were a sufficiently dangerous condition under the trivial defect doctrine to constitute negligence.  *See Coyle*, 954 F.3d at 150 (affirming the district court's finding that the alleged dangerousness of the condition was too trivial under New York law to support a claim of negligence); *see also Tzul*, 2014 WL 4773972, at *5 ("[A]fter considering the height and width of the defect, as well as the time, place, and circumstances of the injury, I find the slightly over one-inch crack here too trivial as a matter of law. (internal quotation marks omitted)); *see also Shiles v. Carillon Nursing & Rehab. Ctr., LLC*, 54 A.D.3d 746, 746 (2008) (finding a less than two-inch elevation differential trivial, noting that nothing obstructed plaintiff's view, and the circumstances – "height and width of the defect, as well as time, place, and circumstances of the injury" -- did not support a finding that it was a trap or snare).

### b.  Notice and Failure to Correct

For trip-and-fall negligence cases, "the plaintiff must demonstrate that the landowner created the condition that caused the injury, or that the landowner had actual or constructive notice of the condition," and "failed to correct it within a reasonable time after acquiring such knowledge."  *Bogery v. United States*, No. 17-CV-6996 (VEC), 2018 WL 4265901, at *3 (S.D.N.Y. Sept. 6, 2018) (quoting *Gonzalez v. Wal-Mart Stores, Inc.*, 299 F. Supp. 2d 188, 192 (S.D.N.Y. 2004)); *Leonardi*, 2013 WL 5295714, at *2.  Plaintiff points to no evidence suggesting that Defendants created the alleged dangerous condition through some affirmative act or had actual notice that the mats had moved in a manner to create overlap.  The parties' dispute under this prong primarily relates to whether Defendants had constructive notice of the alleged dangerous condition.

Constructive notice pertains to defects that are "visible and apparent and … exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." *Ghali v. Wal-Mart Stores E., LP*, No. 18-CV-2495 (CS), 2019 WL 1745704, at *7 (S.D.N.Y. Apr. 18, 2019) (quoting *Gordon v. Am. Museum of Nat'l History,* 67 N.Y.2d 836, 837 (1986)). To that end, if a defendant "should have known of the defect as a result of the condition's manifest nature and the length of time the condition was in existence prior to the accident" a defendant is clearly on constructive notice. *Id.* (internal citations omitted). However, courts will grant a summary judgment motion if a plaintiff fails to establish the duration of the said condition. *Id.*; *Stephanides v. BJ's Wholesale Club, Inc.,* No. 12-CV-83 (CLP), 2013 WL 1694901, at *5 (E.D.N.Y. Apr. 18, 2013) (collecting cases).

Defendants argue that Plaintiff cannot establish that they had constructive notice of a dangerous condition at the Post Office on the date of the accident because Plaintiff has not pointed to any evidence that the alleged condition was visible and apparent, or any evidence pertaining to the time period that the condition existed. (DE 39-1 at 28.) Plaintiff instead contends that Defendants have failed to carry their burden of showing a lack of constructive notice because New York law requires a defendant to establish regularly conducted inspections of the relevant area in temporal proximity to the time of the accident to make that showing. (DE 39 at 18.) Defendants aver that this argument is deficient because summary judgment in federal court follows different rules compared to the inapplicable state law that Plaintiff relies on.

Indeed, the burden of raising a triable issue of fact as to notice falls on Plaintiff. *See Decker v. Middletown Walmart Supercenter Store*, No. 15-CV-2886 (JCM), 2017 WL 568761, at *9 (S.D.N.Y. Feb. 10, 2017) (collecting cases). Postal clerks typically entered the Lobby Area three times per day to replenish forms and postal products. (DE 39-1 at ¶ 47.) PM Philip

testified that postal clerks would, if they saw any "unsafe practice situation, [] try to correct it" before returning to their window.  (DE 39-1 at ¶ 38.)  PM Philip and PC Ceant both also testified that they received no complaints about the mat or any other condition on the day of the accident including from Plaintiff, nor any time prior, and that there had not been any prior accidents.  (DE 39-1 at ¶¶ 35, 40, 53, 55-56.)  Plaintiff herself did not notice any alleged dangerous or defective condition despite waiting in line for 10-15 minutes and having a clear view of the mats, (DE ¶¶ 11, 17, 20).  *See Borts v. United States*, No. 14-CV-89 (ILG) (JO), 2016 WL 2622292, at *2 (E.D.N.Y. Mar. 15, 2016) (granting summary judgment where, *inter alia*, plaintiff had a clear view and testified she did not notice the alleged hazardous condition when walking by it less than an hour before she was injured).

Plaintiff has not introduced any evidence that goes to show a visible and apparent condition.  Nor has Plaintiff introduced any evidence as to the duration that such condition existed for, let alone that it existed for a sufficient amount of time for Defendants to correct it.  *See Lacey v. Target Corp*., No. 13-CV-4098 (RML), 2015 WL 2254968, at *6 (E.D.N.Y. May 13, 2015) ("Regardless, even assuming a reasonable inspection had not taken place, plaintiff has not shown that a reasonable inspection would have discovered the condition, as she cannot establish the length of time that the condition was there to be discovered."); *Decker*, 2017 WL 568761, at *9 (noting that plaintiff's "argument that summary judgment be denied because Defendant offered no proof of prior inspections or cleanings is without merit" and granting summary judgment).

## **CONCLUSION**

Accordingly, the undersigned respectfully recommends Defendants' motion to dismiss pursuant to Rule 12(h)(3) be granted and Defendants' motion for summary judgment in the alternative be denied as moot.  The undersigned further recommends that Defendants' motion for summary judgment be granted if Defendants' motion to dismiss is denied.

## **OBJECTIONS**

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).


Dated:  Central Islip, New York
       February 8, 2023


              **Respectfully recommended,**

              /S/ *James M. Wicks*
              JAMES M. WICKS
              United States Magistrate Judge